## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

------------------------------------------------------------------X

MARSHA HOWARD**,**

Civil Action No.

**Plaintiff,**

v.                                                                                      **COMPLAINT**

UNITED PARCEL SERVICE, INC., JACK BURNT,
individually, and SHILEN BROCKINGTON,                   Plaintiff Demand a
individually,                                                                    Trial by Jury

**Defendants.**

------------------------------------------------------------------X

Plaintiff, MARSHA HOWARD, as and for her Complaint against Defendants

respectfully alleges upon information and belief as follows:

### NATURE OF THE CASE

1.      Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42

U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991,

Pub. L. No. 102-166 ("Title VII")); the Pennsylvania Human Relations Act, as amended, 43

P.S. §§ 951, *et. seq.* ("PHRA"); and under the laws of the Commonwealth of Pennsylvania.

2.      Plaintiff seeks damages to redress injuries Plaintiff suffered as a result of discrimination

and retaliation.

3.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because it involves

questions under federal law under Title VII.

4.      This Court has supplemental jurisdiction over Plaintiff's PHRA claims pursuant to 28

U.S.C. § 1367 because they arise out of the same nucleus of operative facts as Plaintiff's Title

VII claims.

5.      Venue is this judicial district is proper pursuant to 28 U.S.C §1391(b) and 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the acts or omissions giving rise to Plaintiff's claims occurred in Philadelphia, Pennsylvania within the Eastern District of Pennsylvania, and Defendants are subjected to personal jurisdiction here.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.      Around June 4, 2020, Plaintiff timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").

7.      Plaintiff by and through her attorney requested that her Charge be simultaneously filed with the PHRC and the Philadelphia Commission on Human Relations.

8.      The continuing acts of employment discrimination referenced in Plaintiff's charges of discrimination were committed by the following parties: (1) United Parcel Service, Inc.; (2) Jack Burnt; and (3) Shilen Brockington.

9.      Around May 12, 2021, the EEOC issued Plaintiff a Notice of Right to Sue.

10.     This action was being commenced within ninety (90) days of Plaintiff receiving the Notice of Right to Sue.

11.     Plaintiff has complied with all administrative prerequisites to bring this lawsuit.

12.     Plaintiff's PHRA and PFPO claims are ripe because greater than one year has elapsed since PHRC assumed jurisdiction over Plaintiff's Charge.

## PARTIES

13.     Plaintiff is a female resident of the Commonwealth of Pennsylvania, County of Northampton.

14.     At all times material, Defendant United Parcel Service, Inc. (hereinafter referred to as "Defendant UPS") was and is a foreign business corporation duly incorporated under the laws of the State of New York.

15.     At all times material, Defendant UPS was and is a foreign business which did and does conduct business in the Commonwealth of Pennsylvania.

16.     At all times material, Defendant Jack Burnt (hereinafter referred to as "Defendant Burnt") was and upon information and belief remains an employee of Defendant UPS, as a "Part-Time Supervisor."

17.     At all times material, Defendant Burnt held supervisory authority over Plaintiff.

18.     At all times material, Defendant Shilen Brockington (hereinafter referred to as "Defendant Brockington") was and upon information and belief remains an employee of Defendant UPS, as a "Full-Time Supervisor."

19.     At all times material, Defendant Brockington held supervisory authority over Plaintiff.

20.     At all times material, Plaintiff was an employee of Defendants.

21.     At all times material, Defendants were the joint employers of Plaintiff.


**MATERIAL FACTS**

22.     Around October 8, 2018, Plaintiff began working for Defendant UPS as a part- time "Package Handler" at its 1620 Van Buren Road, Tatamy PA 18045 location.

23.     Plaintiff's duties included loading and unloading packages for delivery.

24.     Beginning around November 2018, Plaintiff primarily reported to Defendant Burnt and his supervisor, Defendant Brockington.

25.     Throughout her employment, Plaintiff tried to maintain a professional relationship with
her supervisors and coworkers, who were predominantly male.

26.     For example, around the end of 2018, Plaintiff offered to help her supervisor, Defendant
Brockington, find an apartment because he had recently moved to Pennsylvania. However, a
few months later, Defendant Brockington began to take advantage of his supervisory position
and started to pursue and/or proposition Plaintiff at work

27.     For example, around the beginning of March 2019, while Plaintiff was discussing her
tasks, Defendant Brockington leered at her and stated, "Excuse me for zoning out. **I'm
amazed at your beauty."**

28.     Plaintiff rejected Defendant Brockington's advances, stating, "We're at work. You
shouldn't comment on me in that way."

29.     Based on Plaintiff's reaction, Defendant Brockington temporarily stopped making
inappropriate remarks toward her.

30.     However, shortly after, Defendant Burnt also began to sexually harass and proposition
Plaintiff at work.

31.     For example, around March 25, 2019, **Defendant BURNT leered at Plaintiff's body
and said, "Your butt looks really nice in those pants. Can we do a booty bump?"**
Plaintiff replied, "Absolutely not."

32.     Around the end of May 2019, Plaintiff showed a photograph of her eight-year-old
daughter to Defendant Burnt and Jeffrey Yanello, another employee of Defendants.

33.     Defendant Burnt looked at the photograph and exclaimed, **"She's cute. I would date
her!"**

34.     Plaintiff was disturbed by Defendant Burnt's sexually inappropriate comment toward her young daughter, who is only a child, and walked away.

35.     Beginning around June 2019, based on her strong performance, Plaintiff started working a full-time schedule.

36.     As a result, Plaintiff needed to interact with  her coworkers and supervisors on a daily basis.

37.     Around a few months later, Defendant Brockington resumed his sexual harassment and pursuit of Plaintiff.

38.     For example, and by no means an exhaustive list, around September of 2019, Defendant UPS' "Labeler,"  Stephenson Bramble, told Plaintiff that Defendant Brockington had asked him whether Plaintiff was single and stated that he (Defendant Brockington) wanted to "scoop" ("sleep") with her.

39.     Plaintiff was offended and embarrassed by Defendant Brockington's refusal to stop pursuing her in the workplace, as well as his discussing her, in a sexual manner, with co-workers.

40.     Around the Fall of 2019, Defendant Burnt started to pursue Plaintiff more aggressively.

41.     For example, around October 24, 2019, at the beginning of Plaintiff's shift, Defendant Burnt grabbed a scanner belt, wrapped it around Plaintiff's waist and tried to pull her closer to his body. Plaintiff freed herself from Defendant Burnt's hold and returned to her workstation.

42.     As another example, around October 30, 2019, Defendant Burnt followed Plaintiff to the women's restroom,  stopped in front of the door, and asked, **"Can I come in there with you?"**  Plaintiff replied, "No!"

43.     Around November 19, 2019, in the morning, Plaintiff complained to Defendant UPS'
"Finance Manager," Mark Moncheck about Defendant Burnt's ongoing sexual advances.

44.     Mr. Moncheck instructed Plaintiff to complain directly to Defendant Brockington about
Defendant Burnt.

45.     Plaintiff was reluctant to complain to Defendant Brockington due to his prior harassment,
but she reluctantly complied.

46.     Around November 21, 2019, Plaintiff attended a meeting with Defendant Brockington
and Defendant Burnt. During the meeting, Plaintiff reiterated Defendant Burnt's sexual
advances and the inappropriate remark about her eight-year-old daughter. In the meeting,
**Defendant BURNT admitted to the unlawful workplace conduct.** Defendant Brockington
did not discipline and/or write up Defendant Burnt for his actions.

47.     Defendants failed to remedy the harassment or prevent further harassment.

48.     Instead, Defendant Brockington resumed his own sexually harassing conduct by
spreading a false rumor, to other employees, that he had had sex with Plaintiff.

49.     Specifically, around the end of November 2019, Defendant Brockington falsely told
Plaintiff's coworkers, including co-worker, Stephen Bramble, "I **hooked up with [Plaintiff]
and it was good."**

50.     That week, Mr. Bramble told Plaintiff about Defendant Brockington's sexual
rumor.

51.     Plaintiff was humiliated and told Mr. Bramble that the rumor was false.

52.     That same day, Plaintiff approached Defendant Brockington and asked, "Why did you
tell [Mr. Bramble] that we had sex? You know that's not true."

53.     Defendant Brockington admitted to spreading the false rumor and apologized, stating,
"I'm sorry, I lied. I'll tell [Mr. Bramble] and everyone else that I was lying."

54.     Around December 2019, in retaliation for Plaintiff's rejection of his advances and her
complaints about his inappropriate and unlawful conduct, Defendant Burnt showed his
disdain for Plaintiff, and women in general, by refusing to assist Plaintiff with lifting a heavy
box that weighed over 70 pounds.

55.     Then, in front of Mr. Jones, Mr. Yannello, and Mr. Bramble, Defendant Burnt told
Plaintiff, "If **it was up to me,** I **would only have men working here."**

56.     In further retaliation for Plaintiff's rejection of his sexual advances, Defendant
Brockington started to create a pretextual paper trail of performance issues against Plaintiff
in order to terminate her employment and/or cause her to be constructively discharged.

57.     For example, Defendant Brockington repeatedly threatened Plaintiff with termination for
being even one (1) minute late to her shift, while other employees were not reprimanded if
they showed up late.

58.     As another example, Defendant Brockington reduced Plaintiff's hours from 30- 36
hours/week to 20-24 hours per week.

59.     Similarly, beginning around January 2020, Defendant Brockington stopped allowing
Plaintiff to bring her cell phone to work.

60.     Defendant Brockington also instructed security guards to perform an invasive search of
Plaintiff's body and belongings before the beginning of her shift to ensure that she was
not carrying a cell phone, which in turn, caused Plaintiff to clock in late for her shift.

61.     On multiple occasions, Plaintiff pleaded with Defendant Brockington to allow her to
keep her cell phone in order to communicate with her minor son, who was diagnosed

with autism and ADHD, in case of emergency. Defendants were aware of Plaintiff's

son's medical needs because she previously provided a doctor's note on February 5,

2019. Defendant Brockington refused.

62.     Around January 21, 2020, due to the security guard's intrusive and retaliatory search

of her belongings, Plaintiff was forced to arrive at her workstation approximately five (5)

minutes late

63.     Then, despite knowing that Plaintiff was delayed by the body search, Defendant

Burnt sent Plaintiff home for "arriving late" for her shift.

64.     Later that same day, Plaintiff complained to her "Union President," Dennis Hower

and filed a grievance against Defendant Brockington.

65.     Mr. Hower assisted Plaintiff with requesting  permission  for a "phone pass" so she

could keep her phone during her shift. The phone pass was granted, however, around

February 18, 2020, in continued retaliatory fashion, Defendant Brockington told Plaintiff

that he was revoking her "phone pass."

66.     Later that day, Plaintiff complained to the Human Resources (HR)

Representative, Chanel Brunson, about Defendant Burnt and Defendant Brockington's

ongoing harassment and retaliation. Ms. Brunson instructed Plaintiff to write a statement

and email it to her.  Plaintiff complied.

67.     Despite her ongoing complaints, Plaintiff continued to endure workplace harassment

and retaliation.    For example, Defendant Brockington and Defendant Burnt regularly

waited by the security area at the entrance to the facility to ensure that Plaintiff could not

bring her cellphone to her work station, including, but not limited to, asking security to

"double check" Plaintiff's belongings.

68.      Around February 19, 2020, Defendant Brockington stood by the entrance and told Plaintiff, "You are not coming in with your cellphone." Plaintiff replied, "I have my documentation from the Building Manager, Ronnie Tillman, allowing me to keep it." Defendant Brockington threatened, "If **you don't do what** I **say,** I **will have you escorted out of the building!"** Mr. Tillman intervened and allowed Plaintiff to keep her cellphone for the day.

69.      The next day, in an effort to intimidate Plaintiff from making further complaints, Defendant Brockington approached her and said, *"I* am your boss, not [Mr. Tillman]. I make the rules and [Mr. Tillman] is not allowed to give you permission. From now on, I will allow you to keep your cellphone by me."

70.      Later that same day, Plaintiff again complained to Ms. Brunson about the continued retaliation and harassment. Ms. Brunson promised Plaintiff that she would address the harassment. However, it continued.

71.      Around February 20, 2020, Defendant Brockington stopped Plaintiff as she was leaving the building and demanded that she attend a meeting. Plaintiff asked what the meeting was about, but Defendant Brockington refused to state the purpose and threatened, "If you don't show up, it will be considered job abandonment." Plaintiff explained that she was on her way to pick up her son from school and would not be able to attend. Plaintiff feared termination, but she did not attend the meeting because she is a single mother and the only one who could pick up her autistic son from school.

72.      Around February 21, 2020, Plaintiff arrived to work before the beginning of her 10:15 a.m. shift and clocked in on time.

73.    Later that morning, Defendant Burnt approached Plaintiff and told Plaintiff that her
"clock in" was considered a "clock out." However, this was false. Defendant Burnt changed
Plaintiff's hours and made it appear as though Plaintiff clocked in late.

74.    Later that day, Plaintiff sent an email to Mr. Moncheck informing him about the
erroneous clock-in. Mr. Moncheck told Plaintiff that he would ask Defendant Brockington to
review her hours.  However, Defendants never corrected the error.

75.    Around February 21, 2020, in an email, Plaintiff complained to Ms. Brunson about
Defendant Burnt and Defendant Brockington's harassment and retaliation. Ms. Brunson did
not reply to Plaintiff's email.

76.    That same day, in an email, Plaintiff also complained to Mr. Hower about the harassment
and retaliation from Defendant Burnt and Defendant Brockington.

77.    Around February 22, 2020, Plaintiff notified Mr. Hower and Defendant Burnt that she
was going to be late for her shift. That morning, Plaintiff was approximately eight (8)
minutes late.

78.    Around February 24, 2020, Defendant Brockington called Plaintiff into a meeting with
her "Union Steward," Denise Becker. During the meeting, Defendant Brockington accused
Plaintiff of "attendance issues" for clocking in late on February 20, 2020. During the
meeting, Defendant Brockington also gave Plaintiff two write-ups for purported attendance
issues, including the February 21, 2020, clock-in error, and suspended Plaintiff for a total of
four days.

79.    Later that same day, Plaintiff filed another grievance with her union regarding Defendant
Brockington's retaliatory suspension.

80. Around February 28, 2020, Defendant Brockington gave Plaintiff yet another write-up for "failure to follow procedures" for allegedly leaving her work area to use the bathroom without notifying management. However, Plaintiff informed "Part- time Supervisor," Budd Tremor that she was going to use the bathroom before leaving her workstation. As further evidence of Defendants' retaliatory animus, Defendant Brockington did not enforce this alleged "procedure" with any other employees.

81. Around March 19, 2020 and March 20, 2020, Defendant Brockington instructed Plaintiff's shift supervisor to send her home due to "overstaffing." However, Plaintiff was scheduled to work the "twilight shift" on both days, and Defendants were busy and understaffed due to the COVID-19 pandemic.

82. Defendants' actions were intended to, and did, create a hostile work environment that no reasonable person would tolerate.

83. Defendants would not have harassed Plaintiff but for her sex.

84. Defendants would not have retaliated against Plaintiff but for her sex, opposition, and reports of the unlawful conduct.

85. As a result of Defendants' actions, Plaintiff felt and continues to feel extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

86. As a result of Defendants' discriminatory and intolerable treatment of Plaintiff, she suffered, and continues to suffer, severe emotional distress and physical ailment.

87. As a result of Defendants' actions, Plaintiff felt and continues to feel extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

88.     As a result of the acts and conduct complained of herein, Plaintiff has suffered and willcontinue to suffer the loss of income, the loss of a salary, bonuses, benefits, and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

89.     As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages as against the Defendants,jointly and severally.

90.     The above are just some examples, of some of the discrimination and retaliation to which Defendants subjected Plaintiff to on a continuous and on-going basis throughout Plaintiff's employment.

91.     As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed

92.     As a result of Defendants' conduct and comments, Plaintiff was caused to sustain serious and permanent personal injuries, including permanent psychological injuries.

93.     Plaintiff further claims aggravation, activation and/or exacerbation of any preexisting condition.

94.     As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and

other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

95.    Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

96.    Plaintiff claims that Defendants unlawfully discriminated against her because of her sex and retaliated against her because she opposed the unlawful conduct of Defendants related to the above protected class.

97.    Plaintiff further claims constructive discharge to the extent that Plaintiff was forced to resign from Plaintiff's position as a result of the unlawful discrimination and retaliation.

98.    Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

99.    The Defendants have exhibited a pattern and practice of not only discrimination but also retaliation.

100.    Plaintiff claims alternatively that Plaintiff was an Independent Contractor, and Plaintiff makes all applicable claims for the above conduct and facts under the applicable law pertaining to Independent Contractors. Furthermore, in such case, Plaintiff claims that Defendant owed and breached its duty to Plaintiff to prevent the harassment, discrimination, and retaliation and is liable therefore for negligence.

**FIRST CAUSE OF ACTION**
**DISCRIMINATION UNDER TITLE VII**
**(against UPS only)**

101.    Plaintiff, Marsha Howard, hereby incorporates all allegations contained in the above-

mentioned paragraphs as fully as if they were set forth at length.

102.    This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, for relief based upon the

unlawful employment practices of TPC. Plaintiff complains of Defendant the TPC's violation

of Title VII's prohibition against discrimination in employment based, in whole or in part,

upon an employee's gender.

103.    SEC. 2000e-2. *[Section 703]* states as follows:

(a)  Employer practices

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate
against any individual with respect to his compensation, terms, conditions, or privileges
of employment, because of such individual's race, color, religion, sex, or national
origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way
which would deprive or tend to deprive any individual of employment opportunities or
otherwise adversely affect his status as an employee, because of such individual's race,
color, religion, sex, or national origin.

104.    Defendant UPS engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e

et seq., by discriminating against Plaintiff because of her sex/gender.

105.    As a result of the Defendant UPS's violations of Title VII, Plaintiff has suffered damages

including but not limited to: past and future lost wages, pain and suffering, inconvenience,

mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

## SECOND CAUSE OF ACTION
## TITLE VII HOSTILE WORK ENVIRONMENT
### (against UPS only)

106.   Plaintiff, Marsha Howard, hereby incorporates all allegations contained in the above-mentioned paragraphs as fully as if they were set forth at length.

107.   Title VII also prohibits hostile work environment harassment, defined as unwanted comments or conduct regarding the plaintiff's protected characteristics that have the purpose or effect of unreasonably interfering with the terms and conditions of the plaintiff's employment. Harris v. Forklift Systems, 510 U.S. 17, 21 (1993).

108.   An employer is strictly liable for supervisor harassment that "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998).

109.   Respondent superior liability for the acts of non-supervisory employees exists where "the defendant knew or should have known of the harassment and failed to take prompt remedial action." Andrews v. city of Philadelphia, 895 F.2d 1469, 1486 (3d Cir. 1990).

110.   Employer liability for co-worker harassment also exists where "the employer failed to provide a reasonable avenue for complaint." Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 105 (3d Cir. 2009).

111.   The Third Circuit has held that the retaliation provision of Title VII "can be offended by harassment that is severe or pervasive enough to create a hostile work environment." Jensen v. Potter, 435 F.3d 444, 446 (3d Cir. 2006).

112.    Here, Defendant's conduct occurred because of Plaintiff's legally protected characteristics and was severe or pervasive enough to make a reasonable person of the same legally protected class (sex/gender-female) believe that the conditions of employment were altered, and that the working environment was intimidating, hostile, or abusive.

113.    Plaintiff's supervisors had the authority to control Plaintiff's work environment, and they abused that authority to create a hostile work environment.

114.    Sexually explicit and verbally- and physically- harassing conduct filled the environment of Plaintiff's work area.

115.    Defendant UPS, and its' supervisory employees, knew that the sexually explicit and verbally- and physically- harassing conduct filled Plaintiff's work environment.

116.    Sexually explicit verbally- and physically- harassing conduct occurred on an almost if not daily basis.

117.    Sexually explicit verbally- and physically- harassing conduct caused Plaintiff to sustain severe emotional distress resulting in physical illness.

118.    Plaintiff subjectively regarded the sexually explicit verbally- and physically- harassing conduct as unwelcome and unwanted and objectively opposed the conduct.

119.    The conduct was both severe and pervasive.

120.    The conduct was emotionally damaging and humiliating.

121.    The conduct unreasonably interfered with Plaintiff's work performance.

122.    The conduct was so extreme that it resulted in material changes to the terms and conditions of Plaintiff's employment.

123.    Defendant UPS, and its' supervisory employees, provided a futile avenue for complaint.

124.   Defendant UPS, and its' supervisory employees, acted upon a continuing course of conduct.

125.   As a result of Defendant UPS and its' supervisory employees' violations of Title VII, Plaintiff has suffered damages including but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**THIRD CAUSE OF ACTION**
**RETALIATION UNDER TITLE VII**
**(against UPS only)**

126.   Plaintiff, Marsha Howard, hereby incorporates all allegations contained in the above-mentioned paragraphs as fully as if they were set forth at length.

127.   Title VII protects employees from retaliation for attempting to exercise their rights under the Act:

42 U.S.C. § 2000e-3. Other unlawful employment practices

a.   (a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings. It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.The Supreme Court in Burlington v. N. & S.F. Ry. V. White, 548 U.S. 53, 68 (2006) held that a cause of action for retaliation under Title VII lies

whenever the employer responds to protected activity in such a way that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

128.   Informal complaints and protests can constitute protected activity under the "opposition" clause of 42 U.S.C. § 2000e-3(a). Moore v. City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006) ("Opposition to discrimination can take the form of informal protests of discriminatory employment practices, including making complaints to management.").

129.   Title VII's anti-retaliation provision also protects employees who speak out about discrimination by answering questions during an employer's internal investigation. Crawford v. Metropolitan Gov't of Nashville and Davidson Cty., Tennessee, 555 U.S. 271, 277 (2009) (declaring that there is "no reason to doubt that a person can 'oppose' by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question.").

130.   Retaliation need not be job-related to be actionable under Title VII—an employer can effectively retaliate against an employee by taking actions not directly related to her employment or by causing her harm outside the workplace. White, 548 U.S. at 61-62 (rejecting authority from the Third Circuit and others requiring that the plaintiff suffer an adverse employment action in order to recover for retaliation).

131.   "[A] plaintiff need not prove the merits of the underlying discrimination complaint, but only that 'he was acting under a good faith, reasonable belief that a violation existed.'" Aman

v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996); Griffiths v. CIGNA Corp., 988 F.2d 457, 468 (3d Cir. 1993); and Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990), overruled on other grounds by Miller v. CIGNA Corp., 47 F.3d 586 (3d Cir.1995).

132.    An employee need not be a member of a protected class to be subject to actionable retaliation under Title VII. See Moore, 461 F.3d at 342 ("Title VII's whistleblower protection is not limited to those who blow the whistle on their own mistreatment or on the mistreatment of their own race, sex, or other protected class."

133.    Title VII not only bars retaliation against the employee who engaged in the protected activity; it also bars retaliation against another employee if the circumstances are such that the retaliation against that employee might well dissuade a reasonable worker from engaging in protected activity. See Thompson v. North American Stainless, LP, 131 S. Ct. 863, 868 (2011).

134.    Here, the Defendant UPS, and its' supervisory employees, discriminated against Plaintiff because of her protected activity under Title VII.

135.    Plaintiff acted under a reasonable, good faith belief that her right to be free from discrimination on the basis of sex/gender was violated.

136.    Plaintiff was subjected to materially adverse actions at the time or after the protected conduct took place.

137.    Defendant UPS, and its' supervisory employees, engaged in an unlawful discriminatory practice by retaliating and otherwise discriminating against Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

138.    There was a causal connection between the Defendant UPS, and its' supervisory employees, materially adverse actions, and Plaintiff's protected activity.

139.   Defendant UPS, and its' supervisory employees, actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in protected activity.

140.   Defendant UPS, and its' supervisory employees, acted upon a continuing course of conduct

141.   Plaintiff will rely on a broad array of evidence to demonstrate a causal link between their protected activity and the Defendant UPS, and its' supervisory employees, actions taken against her, such as the unusually suggestive proximity in time between events, as well as Defendant UPS supervisory employees' antagonism and change in demeanor toward Plaintiff after Defendant UPS, and its' supervisory employees, became aware of Plaintiff's protected activity.

142.   As a result of the Defendant UPS, and its' supervisory employees, violations of the PHRA, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.


**FOURTH CAUSE OF ACTION**
**DISCRIMINATION UNDER STATE LAW**
**(against all Defendants)**


143.   Plaintiff, Marsha Howard, hereby incorporates all allegations contained in the above-mentioned paragraphs as fully as if they were set forth at length.

144.   The PHRA § 955 provides that it shall be an unlawful discriminatory practice:

"(a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or

support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required."

145.   Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of Plaintiff's sex/gender.

146.   Plaintiff hereby makes a claim against Defendants under all the applicable paragraphs of the PHRA § 955.

147.   As a result of the Defendants' violations of the PHRA, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**FIFTH CAUSE OF ACTION**
**RETALIATION UNDER STATE LAW**
**(against all Defendants)**

148.   Plaintiff, Marsha Howard, hereby incorporates all allegations contained in the above-mentioned paragraphs as fully as if they were set forth at length.

149.   PHRA § 955(d) provides that it shall be an unlawful discriminatory practice: " For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice

forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act.

150.   Defendants engaged in an unlawful discriminatory practice by retaliating and otherwise discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

151.   There was a causal connection between the Defendants' materially adverse actions and Plaintiff's protected activity.

152.   The Defendants' actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in protected activity.

153.   The Defendants acted upon a continuing course of conduct.

154.   Plaintiff will rely on a broad array of evidence to demonstrate a causal link between her protected activity and the Defendants' actions taken against her, such as the unusually suggestive proximity in time between events, as well as Defendants' antagonism and change in demeanor toward Plaintiff after Defendants became aware of Plaintiff's protected activity.

155.   As a result of the Defendants' violations of the PHRA, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

## SIXTH CAUSE OF ACTION
## AIDING AND ABETTING UNDER STATE LAW
## UNDER STATE LAW
### (against Defendant Burnt and Defendant Brockington)

156.   Plaintiff, Marsha Howard, hereby incorporates all allegations contained in the above-mentioned paragraphs as fully as if they were set forth at length.

157.   PHRA § 955(e) provides that it shall be an unlawful discriminatory practice: " For any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice."

158.   Defendants engaged in an unlawful discriminatory practice in violation of PHRA §955(e) by committing, aiding, abetting, inciting, compelling and coercing the discriminatory conduct.

159.   As a result of the Defendants' violations of the PHRA, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

### JURY DEMAND

Plaintiff, Marsha Howard, requests a jury trial on all issues to be tried.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Marsha Howard, demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress, back pay and front pay, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated:  Philadelphia, Pennsylvania                 **DEREK SMITH LAW GROUP, PLLC**

       August 6, 2021                                     *Attorneys for Plaintiff Marsha Howard*

                                         By:  _/s/ Catherine W. Smith, Esq._____
                                           Catherine W Smith, Esquire
                                           1835 Market Street, Suite 2950
                                           Philadelphia, Pennsylvania 19103
                                           (215) 391-4790
                                           catherine@dereksmithlaw.com